**COMMISSION HOUSE DRIVERS, HELPERS, AND EMPLOYEE'S UNION, LOCAL 400, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, Plaintiff,**

v.

**TEAMSTERS JOINT COUNCIL NO. 41, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, et al., Defendants.**

**No. C 80–770.**

United States District Court, N.D. Ohio, E.D.

Sept. 24, 1984.

Lawrence M. Oberdank, and Anthony W. Hackenberg, Cleveland, Ohio, for plaintiff.

Robert M. Baptiste, and Joseph E. Santucci, Washington, D.C., and Sorrell Logothetis, Dayton, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

LAMBROS, District Judge.

Plaintiff Commission House Drivers, Helpers, and Employee's Union, Local 400, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America (Local 400) formerly represented approximately 450 employees of American Seaway Foods, Inc. (Seaway). On October 5, 1979 defendant Teamsters Joint Council No. 41, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America (Joint Council 41), an unincorporated association of approximately 30 Teamsters locals, transferred control over Seaway's employees from Local 400 to Teamsters Union Local 507, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America (Local 507). On October 11, 1979 Local 400, after unsuccessfully seeking relief from the National Labor Relations Board (NLRB), appealed Joint Council 41's decision to the General Executive Board of defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America (International). On January 29, 1980 the General Executive Board affirmed the decision of Joint Council 41. Local 400 then filed this action in which it seeks damages and an injunction requiring defendants to revest it with control over Seaway's employees.

This case is presently before this Court on defendants' motions for summary judgment.

## I. Facts

Rule 56(c) of the Federal Rules of Civil Procedure provides that a district court may grant summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "In ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant." *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir.1962). Moreover, " 'on summary judgment the inferences to be drawn from the underlying facts contained in [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion.' " *Adickes v. S.H. Kress Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970) (quoting *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam)).

Under these standards of review, the record in this case reveals the following pertinent facts. Prior to 1979 Local 400 had long served as the exclusive bargaining representative for Seaway's employees. Local 507 had not represented any of Seaway's employees but, during the years preceding the outbreak of this dispute, it had absorbed the employees of a number of other Cleveland-area grocery businesses.

During the early summer of 1979 Local 400 commenced its efforts to negotiate a new collective bargaining agreement with Seaway. Local 400 failed, however, to obtain a new contract by June 30, 1979—the date on which the old contract was scheduled to expire. On June 30th the officers of Local 400 met with Seaway's employees to discuss the members' contract demands. At this meeting Charles Cimino, Jr., Vice President of Local 400, reminded the members that the Teamsters constitution prohibited them from striking without first obtaining approval from the Joint Council and the International. Despite this admonition, on July 1st Local 400's members went out on a one day wildcat strike.

On July 2nd Local 400 received a mailgram from International President Frank E. Fitzsimmons in which he authorized a strike by Local 400 but conditioned his approval upon Local 400 obtaining strike approval from International Vice President Jackie Presser. It should be noted that Jackie Presser was also Vice President of Joint Council 41 and President of Local 507. Presser did not respond to Local 400's numerous strike authorization requests. Thus, Local 400 was placed between a rock and a hard place: if it failed to strike its members would perceive it as being unresponsive to their demands; if it struck it would violate President Fitzsimmon's command.

In the meantime, Jackie Presser, his brother William (President of Joint Council 41), and other members of Joint Council 41 met with 7 dissident members of Local 400. This was the first in a series of meetings at which Seaway employees voiced their dissatisfaction with Local 400 and discussed methods for obtaining adequate representation. Local 400's officers were excluded from several of these meetings. Moreover, at the meetings they were allowed to attend, Local 400's officers were denied a reasonable opportunity to respond to the charges leveled against them. This series of meetings culminated with a gathering of most of Local 400's members on September 30, 1979. At that meeting the members voted by secret ballot to determine whether the majority preferred to continue to be represented by Local 400 or wished to switch to another local. According to the defendants' uncontradicted affidavit, Local 400's members cast 15 votes in favor of Local 400, 33 votes in favor of Local 407, and 281 votes in favor of Local 507.

Shortly after this meeting, a panel appointed by the Executive Board of Joint

Council 41 recommended to the Board that it transfer control over Seaway's employees from Local· 400 to Local 507. The Board then voted unanimously to adopt the panel's recommendation. On December 11, 1979 Local 507 and Seaway entered into a collective bargaining agreement governing the former members of Local 400. This arrangement received the International's tacit approval when, on January 29, 1980, it rejected Local 400's appeal.

## II. Law

Local 400's basic theory of this case is that the Joint Council and the International did not accord it a reasonable hearing before divesting it of control over Seaway's employees. Local 400 maintains that it was entitled to the procedural safeguards provided by the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 29 U.S.C. §§ 401–531 (LMRDA), and by the Teamsters constitution.

### A. Local 400's Claim Under LMRDA

 Potentially, LMRDA provides Local 400 with substantial procedural safeguards. The statute provides in pertinent part,

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(5).

It is essential to note that § 411(a)(5) of LMRDA only applies to "member[s] of labor organization[s]." In *Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), the Supreme Court considered an LMRDA action by the former business agent of a Teamsters local who alleged that the newly elected local president had discharged him because he had supported the Local's incumbent president. The Court, construing §§ 411(a)(1), 411(a)(2), and § 529, held that the business agent

was not protected by these sections because, *inter alia*, he was not a "member of a labor organization" within the meaning of the Act. *Finnegan*, 456 U.S. at 442, 102 S.Ct. at 1873. Similarly, in *Cehaich v. International Union, United Automobile, Aerospace, and Agricultural Implement Workers*, 710 F.2d 234, 240 (6th Cir.1983), the United States Court of Appeals for the Sixth Circuit held that a union benefits representative was not protected against summary dismissal by his union because, in his position as a union officer, he was not a "member of a labor organization" within the meaning of various sections of LMRDA including § 411(a)(5).

This Court believes that *Finnegan* and *Cehaich* control this case and oblige it to hold that Local 400 is not a "member of a labor organization" within the meaning of § 411(a)(5). This holding accords with Congress's intent in passing LMRDA; the statute was only intended to protect "rank and file union members." *Finnegan*, 456 U.S. at 437, 102 S.Ct. at 1871. A union local, just like a union officer, is a higher component of the union's organizational structure, not a member of the rank and file. Given this Court's holding that Local 400 is not a "member of ·a labor organization" under § 411(a)(5), this Court also holds that Local 400 is not entitled to the procedural safeguards of LMRDA.

### B. Local 400's Claim Under the Teamsters Constitution

Local 400's second theory of relief is that the Joint Council and the International violated the Teamsters constitution by assigning Seaway's employees to Local 507. *See United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry v. Local 334, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry*, 452 U.S. 615, 627, 101 S.Ct. 2546, 2553, 69 L.Ed.2d 280 (1981) (federal court had jurisdiction under the Labor-Management Relations Act of 1947, 61 Stat. 156, 29 U.S.C. § 185(a) (LMRA), to entertain an action by

a union local alleging that the parent union had breached the union's constitution).

■ Local 400 has presented alternative theories on how defendants violated the Teamsters' constitution. In its complaint, Local 400 asserted that defendants breached the constitution by failing to adhere to the procedures provided by art. XII, § 12 of the constitution which governs the resolution of "jurisdictional disputes." In its brief in response to defendants' motion for summary judgment, plaintiff downplays this argument and asserts that defendants' actions were void because they were not authorized by the Teamsters constitution.

Plaintiff's decision not to rely on art. XII, § 12 of the Teamsters constitution is understandable in light of the scope of that provision. It governs cases "where two (2) or more Local Unions are in dispute concerning jurisdiction." This case is distinguishable from the traditional jurisdictional dispute between two locals envisioned by this constitutional provision. True, Local 507 played a role in Local 400's fall from power. The members of Local 400, however, played a far more important role. The members' role is most apparent in the vote of September 30, 1979 when they voted overwhelmingly in favor of moving to Local 507. This was the principal fact that caused counsel for the NLRB to recommend to the regional director that the Board should not charge Seaway with an unfair labor practice for ceasing to bargain with Local 400 and for bargaining with Local 507. *See* Memorandum from Harold J. Tatz, Associate Counsel to the NLRB, to Bernard Levine, Director of Region 8 for the NLRB, page 7 (April 30, 1980) (contained in defendant's exhibit S). This vote also compels this Court to hold that the instant dispute was not a "jurisdictional dispute" as envisioned by art. XII, § 12 of the constitution but instead was a dispute between a local and its members. As this Court holds that art. XII, § 12 is inapplicable to this case, it must also hold that Local 400 cannot lay claim to the procedural safeguards provided by that provision.

■ This Court is confronted finally with plaintiff's contention that defendants' conduct was *ultra vires.* Article IX, § 1 of the Teamsters constitution provides,

Such powers, duties and authority as are not otherwise delegated to the General President and General Secretary-Treasurer of the International Union shall be exercised, acted upon, and determined by the General Executive Board. The General Executive Board shall have the authority to interpret and apply the Constitution and laws of the International Union and to decide all questions of law thereunder subject to appeal to the next Convention. The General Executive Board shall have governing authority over the International Union and its subordinate bodies to the end of upholding the laws and policies of the Brotherhood as expressed in this Constitution.

This Court believes that the General Executive Board acted in conformity with art. IX, § 1 of the constitution when it granted Local 507 control over Seaway's employees. The General Executive Board confronted a unique situation that demanded a unique response. Absent a specific limitation in a union constitution, this Court will not interfere with the efforts of a union's leaders to manage the affairs of their organization. Accordingly, this Court holds that the International did not commit an *ultra vires* act by vesting control over Seaway's employees in Local 507. This Court also holds that Joint Council 41 did not violate the Teamsters constitution because its actions were ratified by the General Executive Board of the International. *See Operative Plasters' and Cement Masons' International Ass'n., Local 202 v. Metropolitan New York Dry Wall Contractors Ass'n.,* 543 F.Supp. 301, 311 (E.D.N.Y.1983) (parent union had inherent power under its constitution to withdraw jurisdiction over drywall plastering from one local and vest jurisdiction in another local).

In light of the foregoing opinion, defendants' motions for summary judgment are granted.

This action is terminated.

IT IS SO ORDERED.